IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

LAKEESHA WILLIAMS,                    )      CASE NO. 1:17CV1137
                                      )
                    Plaintiff,        )
                                      )      JUDGE BENITA Y. PEARSON
            v.                        )
                                      )      MAGISTRATE JUDGE
                                      )      KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                )
SECURITY ADMINISTRATION,              )
                                      )      **REPORT AND RECOMMENDATION**
                    Defendant.        )

Plaintiff Lakeesha Williams ("Williams") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

### I. Procedural History

In July 2013, Williams filed applications for DIB and SSI, alleging a disability onset date

of June 16, 2013.  Tr. 223, 254.  She alleged disability based on the following: fibromyalgia,

scoliosis, depression, asthma, and high blood pressure.  Tr. 259.  After denials by the state

agency initially (Tr. 112, 113) and on reconsideration (Tr. 142, 143), Williams requested an

administrative hearing.  Tr. 174.  A hearing was held before Administrative Law Judge ("ALJ")

Scott R. Canfield on August 13, 2015.  Tr. 33-66.  In his March 1, 2016, decision (Tr. 18-28), the

ALJ determined that there are jobs that exist in significant numbers in the national economy that Williams can perform, i.e. she is not disabled.  Tr. 27.  Williams requested review of the ALJ's decision by the Appeals Council (Tr. 219) and, on May 10, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Williams was born in 1977 and was 35 years old when she filed her applications.  Tr. 223.  She has a GED and previously worked as a daycare worker and a cashier in a parking garage.  Tr. 41, 43-44.

### B. Relevant Medical Evidence[1]

On May 6, 2013, Williams went to the emergency room complaining of right sided weakness.  Tr. 319.  Upon exam, she was alert and oriented.  Tr. 321.  A few days later, she followed up at a medical center and reported that she was not seeing a mental health specialist and was not depressed.  Tr. 360.  She had a job as a cashier, a house, and a boyfriend.  Tr. 360.

On January 6, 2014, Williams saw her general practitioner, Alexandria Howard, M.D., for a follow-up visit for her back pain.  Tr. 355.  Dr. Howard commented that Williams was compliant with her current medications, including amitriptyline for her depression, and that she had a history of adverse response to SNRI therapy, including suicidal thoughts.[2]  Tr. 355.  Upon exam, she was alert, in no acute distress, and had a normal mood and affect.  Tr. 357.

On April 14, 2014, Williams began treating with rheumatologist Howard Smith, M.D., for fibromyalgia.  Tr. 478.  She denied depression and anxiety.  Tr. 480.  Upon exam, she was in

---

[1]  Williams only challenges the ALJ's findings regarding her psychological impairments.  Accordingly, only the medical evidence relating to these impairments is summarized and discussed herein.

[2]  SNRI (serotonin-norepinephrine reuptake inhibitors) is a class of medications used to treat depression.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 940.

no acute distress, she was alert and oriented, her recent and remote memory were intact, and her mood, affect, judgment, and insight were appropriate.  Tr. 482.  Dr. Smith remarked that the cornerstones of therapy for fibromyalgia were optimal sleep, regular aerobic exercise and optimal treatment of depression.  Tr. 479.  He assessed her fibromyalgia as stable.  Tr. 479.

On June 16, 2014, Williams followed up with Dr. Smith and reported that she was doing about the same.  Tr. 498.  Upon exam, she was in no acute distress, was alert and oriented, her recent and remote memory were intact, and her mood, affect, judgment, and insight were appropriate.  Tr. 498.

On July 10, 2014, Williams followed up with Dr. Howard for medication management.  Tr. 395.  She told Dr. Howard that she was having a commitment ceremony in a few weeks and she was planning her wedding for next year.  Tr. 396.  Upon exam, she was alert and in no acute distress, her judgment and insight were intact, and her mood and affect were normal.  Tr. 398.

On September 8, 2014, Williams saw Dr. Smith for a follow-up appointment.  Tr. 509.  She reported that, overall, she was doing the same.  Tr. 509.  Upon exam, she was in no acute distress, she was alert and oriented, her recent and remote memory were intact, and her mood, affect, judgment, and insight were appropriate.  Tr. 511.  On December 18, 2014, Williams visited Dr. Howard's office for unrelated complaints; upon exam, her mood and affect were normal and her judgment and insight were intact.  Tr. 421, 424.

On January 19, 2015, Williams saw Dr. Smith complaining of diffuse aches and pains and admitted to being significantly depressed.  Tr. 518.  Upon exam, she was in no acute distress, she was alert and oriented, her recent and remote memory were intact, and her mood, affect, judgment, and insight were appropriate.  Tr. 519.  Dr. Smith referred her to psychiatry.  Tr. 517.

On March 18, 2015. Williams saw Nina P. Booker, LISW, for "depression/not functioning."  Tr. 526.  Booker referred her to Community Mental Health Center.  Tr. 528.

On April 20, 2015, Williams followed up with the rheumatology clinic.  Tr. 529.  She reported that her mood overall was better and she was observed to have an improved mood from her last visit, when she was in tears throughout the whole visit.  Tr. 530.  She appeared well and was very conversant.  Tr. 531.

On May 22, 2015, Williams began a course of water physical therapy and was observed to be alert, oriented, and cooperative.  Tr. 543.

Williams returned to the rheumatology clinic on July 20, 2015.  Tr. 577.  She reported that she was physically active, doing things such as walking to the park with her children.  Tr. 577.  She had a sleep study done and was waiting for a CPAP machine.  Tr. 577.  She reported continued depression and anxiety attacks.  Tr. 577.  Upon exam, she "looked well," was in no acute distress, and she was alert and oriented.  Tr. 579.  She was advised to see a psychiatrist. Tr. 583.

### C. Opinion Evidence

#### 1. Consultative Examiners

Dr. Zerba: On December 7, 2010, Williams saw Margaret Zerba, Ph.D., for a consultative psychological examination in connection with her prior application for disability benefits.  Tr. 309.  She told Dr. Zerba that she had had depression, had not received mental health services, and stated that she was no longer depressed since she had been taking anti-depressant medication.  Tr. 309-310.  She had trouble with panic attacks, but with her medication she only had about one per month.  Tr. 310.  She had applied for disability benefits because fibromyalgia had rendered her incapable of doing daily tasks.  Tr. 312.  Dr. Zerba diagnosed her with major

4

depressive disorder and panic disorder without agoraphobia and opined that Williams' ability to understand and follow directions and to pay attention to perform simple, repetitive tasks was not impaired.  Tr. 312.  Her ability to relate to others in the work environment and to withstand the stress and pressures of day-to-day work activity was moderately impaired due to depression, problems with sleep, and panic attacks.  Tr. 312-313.

Dr. Josell: On October 31, 2013, Williams saw Paul G. Josell, Psy.D., for a psychological consultative evaluation in connection with her current application.  Tr. 349.  Williams reported that she and her three children had been homeless for the past year and were currently living in a shelter.  Tr. 349.  She was not comfortable in closer spaces but had been "OK" at the shelter and was able to go to the store.  Tr. 350.  She was able to care for personal grooming and hygiene, managed things as a single parent of her three children, and followed the rules and requirements of living in shelters.  Tr. 350.  On a typical day, she got up at 6:00 a.m., got her kids off to school, and sometimes returned to the shelter to read, use the internet for Facebook, and/or sometimes interact with others.  Tr. 350.  She picked her kids up after school and then they would do homework.  Tr. 350.  She had to clean the bathroom at the shelter every three days and attended church on Sundays.  Tr. 350.  She reported having previously worked as a cashier at a parking garage, that she was generally able to perform the duties of the job, and she denied problems interacting with customers despite being sad and agitated at times.  Tr. 349.  She was fired for missing days due to her physical problems.  Tr. 349.

Upon exam, Williams was initially irritable and tearful and became increasingly agitated with questioning.  Tr. 350.  As the session progressed, she was able to calm down enough to answer questions adequately but struggled with some cognitive tasks.  Tr. 350.  She was alert and oriented, appropriately groomed, her speech was normal, and her thought processes were

generally normal in range, appropriate to thoughts, and more forthcoming as the session progressed.  Tr. 350.  She reported "some" anxiety attacks although her description was "rather vague" in nature and her attacks improved some with medication.  Tr. 350.  She had limited immediate recall, attention, concentration, and ability for abstract thinking.  Tr. 350-351.  She had variable social judgment.  Tr. 351.

Dr. Josell diagnosed mood disorder NOS and nicotine dependence.  Tr. 352.  He opined that Williams would have some impairment in her ability to: understand, remember, and carry out instructions, as she exhibited "some mild comprehension difficulties (consistent with estimated Low Average intellectual abilities)"; maintain attention and concentration, persistence, and pace to perform tasks and multi-step tasks to the extent that her emotions interfered with focus and follow through; and to respond appropriately to work pressures in a work setting to the extent that her pain caused her to become emotionally upset.  Tr. 352.  He opined that her ability to respond appropriately to supervision and to coworkers in a work setting did not appear to be significantly impaired at that time.  Tr. 352.  He stated that Williams struggled in managing her emotions and that if she found employment, supportive supervisors and coworkers would be critical in helping her to better adjust and cope in a work setting.  Tr. 352.

### 2. State Agency Reviewers

On November 14, 2013, state agency psychologist Karen Terry, Ph.D., reviewed Williams' record.  Tr. 89-91.  Regarding her mental RFC, Dr. Terry opined that Williams would not be significantly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a

normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  Tr. 90-91.  She would have moderate limitations in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  Tr. 90-91.  She would have marked limitations in her ability to interact appropriately with the general public.  Tr. 91. She can relate superficially and minimally with others when she chooses to, would perform optimally in a more solitary setting where tasks do not require direct collaborative efforts with others for task completion and she is not required to interact with the general public.  Tr. 91. Criticism should be constructive and presented in a nonthreatening manner and she would do well in a static non-public working environment.  Tr. 91.  Changes would need to occur infrequently, be adequately and easily explained ahead of time, and be shown by example and with encouragement.  Tr. 91.

On February 19, 2014, state agency reviewer Cindy Matyi, Ph.D., reviewed Williams' record and adopted Dr. Terry's RFC assessment.  Tr. 123-125.

**D.  Testimonial Evidence**

**1. Williams' Testimony**

Williams was represented by counsel and testified at the administrative hearing.  Tr. 39-57.  She testified that she lives with her husband and two teenaged children.  Tr. 39-40.  She took a bus to the hearing and she had no difficulties.  Tr. 40.

Williams stated that the main issue preventing her from working full-time is her lupus.  Tr. 41.  She has pain throughout her body.  Tr. 42.  She also has asthma and is on medication for it.  Tr. 45.  She is on medication for her depression.  Tr. 47.  Her medication helps with this.  Tr. 47-48.  She still has crying spells about three times a month and they last for about 20 minutes.  Tr. 50.  She stops crying when her kids or her husband sit in the room with her and talk to her.  Tr. 51.  She sometimes still feels irritable.  Tr. 51.  Her medication helps with this.  Tr. 51.  Her pain affects her emotions a lot because, when she tries to do something, she can't because she hurts so much.  Tr. 51.  She does not cook but she makes herself sandwiches and uses a microwave, folds laundry, and straightens up things if she is sitting down.  Tr. 49.  She does not do other chores.  Tr. 49.  She goes grocery shopping and uses a mechanized cart in the store.  Tr. 50.

Williams testified that, due to her physical ailments, she has difficulty climbing stairs, sitting for more than 30 minutes, standing for more than 20 minutes, and lying down for more than 30 minutes.  Tr. 51-52.  She has swelling in her joints 2-3 times a week that lasts about 1-2 weeks.  Tr. 52.  In an eight-hour period, she sits with her legs elevated up to her chest for 4 hours and lies down about 5 hours, in intervals.  Tr. 53.  She has side effects from her medications such as dry mouth, drowsiness, dizziness, and short-term memory loss.  Tr. 53.  She forgets things from the day before and, when she talks to people, they will have to use a "keyword" for her to remember and sometimes, even then, she may not remember.  Tr. 54.  When she starts a task,

such as folding clothes or writing, she generally does not finish it because she is in so much pain. Tr. 54.

When asked how she handles criticism, Williams responded, "I don't care." Tr. 54. When asked to explain, she added, "If they criticize me, they just criticize me.  I am who I am." Tr. 54.  If she were in a work situation and her supervisor criticized her, she would say "yes sir," walk away, and correct what she was doing.  Tr. 54-55.  She does not have difficulty getting along with other people because she isn't around other people, she is always in the house.  Tr. 55.  When she was working, she was "okay....said hi and bye and how you doing and that would be it."  Tr. 55.  When asked if she would have problems getting along with others if she were working now, she answered, "No."  Tr. 55.  She thinks that her depression would interfere with her ability to work because she gets upset and cries "out of the blue," she gets angry, and if she snaps at her employer they will fire her.  Tr. 55.  When asked why she would snap at her employer, she answered, "I just have days where I'm angry and days when I'm okay."  Tr. 55. Her medication helps on angry days "but it's still there."  Tr. 55.  When she is angry she goes to her room and stops talking to everybody.  Tr. 55-56.  For the last four days, she has not talked to her neighbors or her spouse, she just reads a book.  Tr. 56.  When asked if she has problems when she goes out in public, for example to the grocery store, she stated that she goes, does what she has to do, and then comes back home.  Tr. 56.  She did not have problems with people when she was working in the parking garage.  Tr. 56.  "[A]ll I did was take their money, put the thing in, and give them their receipt."  Tr. 57.  She did not have to talk to them very much.  Tr. 57.

## 2. Vocational Expert's Testimony

Vocational Expert Ted Macy ("VE") testified at the hearing.  Tr. 57-65.  The ALJ discussed with the VE Williams' past work as a child care attendant and parking lot cashier.  Tr.

58-60.  The ALJ asked the VE to determine whether a hypothetical individual with Williams'

vocational profile could perform her past work if that person had the following characteristics:

can perform medium work, can never climb ladders, ropes or scaffolds; can frequently climb

ramps or stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to

fumes, odors, dust, gases, and poorly ventilated areas; can perform simple, routine tasks with no

fast-paced work, no strict production quotas, only simple work instructions and decisions, and

minimal or infrequent changes in the work setting; and is limited to occasional and superficial

interaction with the public, coworkers, and supervisors.  Tr. 60-61.  The VE answered that such

an individual could perform Williams' past work as a cashier but not as a daycare attendant.  Tr.

61.  The ALJ asked the VE if his answer would change if the hypothetical individual were

limited to light work and the VE stated that his answer would not change.  Tr. 61.  The ALJ

asked the VE whether his answer would change if the individual was further limited to having to

alternate positions between sitting and standing at approximately 30-minute intervals with no

loss of productivity, i.e., the individual would remain at the work station.  Tr. 61-62.  The VE

answered that his answer would not change.  Tr. 62.  The ALJ asked the VE if his answer would

change if the individual was further limited to sedentary work, and the VE stated that such an

individual could not perform Williams' past work.  Tr. 62.  The ALJ asked if there was other

work for such an individual and the VE replied that such an individual could perform work as a

table worker (54,000 national jobs, 400 regional jobs); final assembler (90,000 national jobs, 600

regional jobs); and bonder (40,000 national jobs, 250 regional jobs).  Tr. 62.

 Next, Williams' attorney asked the VE whether his answer would change to any of the

ALJ's hypotheticals if the individual would need criticism to be constructive and presented in a

non-threatening manner and any changes would need to be shown by example and with

encouragement.  Tr. 63.  The VE stated that such a requirement would amount to an accommodation and there would be no jobs.  Tr. 63-64.  Williams' attorney asked whether the individuals described by the ALJ could still perform work if they would be off task 20% of the workday, or absent 2 days a month, or would have to elevate their legs for at least 2 hours a day above their heart, and the VE stated that such a person with any of these limitations could not perform any jobs.  Tr. 63-64.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a

listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his March 1, 2016, decision, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.  Tr. 20.

2.     The claimant has not engaged in substantial gainful activity since June 16, 2013, the alleged onset date.  Tr. 20.

3.     The claimant has the following severe impairments: asthma, systemic lupus erythematosus, fibromyalgia, obesity, and depressive disorder.  Tr. 21.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 21.

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

5.     The claimant has the residual functional capacity to perform light work as
       defined in 20 CFR 404.1567(b) and 416.967(b) except she can never
       climb ladders, ropes, or scaffolds.  She can frequently climb ramps and
       stairs, balance, stoop, kneel, crouch, and crawl.  She should avoid
       concentrated exposure to fumes, odors, dusts, gases, and poorly
       ventilated areas.  The claimant is further limited to simple, routine tasks
       with no fast-paced work, no strict production quotas, only simple work
       instructions and decisions, and minimal or infrequent changes in the work
       setting.  Finally, she is limited to occasional and superficial interaction
       with the public, coworkers, and supervisors.  Tr. 23.

6.     The claimant is capable of performing past relevant work as a parking lot
       cashier.  This work does not require the performance of work-related
       activities precluded by the claimant's residual functional capacity.  Tr.
       27.

7.     The claimant has not been under a disability, as defined in the Social
       Security Act, from June 16, 2013 through the date of this decision.  Tr.
       28.

## V. Plaintiff's Arguments

Williams argues that the ALJ's RFC determination regarding her mental impairments is

not supported by substantial evidence because she failed to fully and fairly evaluate her

limitations.  Doc. 16, p. 1.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d
383, 387 (6th Cir. 1984).

   First, Williams argues that the ALJ erred because, in his paragraph B findings at his Step
Three analysis, he found that Williams was moderately limited in social functioning and the
ability to sustain attention and concentration, but the ALJ's RFC assessment did not include
these findings.  Doc. 16, p. 11.  This argument fails because an "ALJ does not have to include
paragraph B finding[s] in his RFC finding."  *Pinkard v. Comm'r of Soc. Sec.*, 2014 WL 3389206,
at *10 (N.D. Ohio July 9, 2014) (explaining that paragraph B findings at Step Three are not RFC
findings pertaining to Steps Four and Five of the sequential evaluation process).  Moreover, the
ALJ's moderate findings in the paragraph B criteria at Step Three are consistent with his RFC
assessment.  At Step Three, the ALJ had found Williams to be moderately limited in her ability
to interact independently, appropriately and effectively with others on a sustained bases (Tr. 22);
his RFC assessment limited her to occasional (up to 1/3 of the time), superficial interaction with
others (Tr. 23).  At Step Three, the ALJ found Williams to be moderately limited in her ability to
sustain focused attention and concentration sufficiently long to permit the timely and appropriate
completion of tasks commonly found in work settings (Tr. 22) and his RFC assessment limited
her to simple, routine tasks with no fast-paced work, no strict production quotas, only simple
work instructions and decisions, and minimal or infrequent changes in the work setting (Tr. 23).
As explained more fully below, the ALJ's RFC assessment was supported by substantial
evidence and was consistent with his Step Three findings.  *See, e.g., Shinlever v. Berryhill*, 2017
WL 2937607, at *4-6 (E.D. Tenn. July 10, 2017) (discussing case law in the Sixth Circuit and
other circuits regarding the issue of paragraph B findings at Step Three; the difference between

the levels of impairment at Step Three; and explaining that the ultimate inquiry is whether substantial evidence supports the ALJ's RFC assessment).

Williams argues that the ALJ failed to incorporate Dr. Josell's opinion that supportive supervisors and coworkers would be critical in helping Williams cope in a work setting into his RFC assessment.  Doc. 16, p. 11.  She also objects to the ALJ's treatment of the opinions of the state agency reviewing psychologists, Drs. Terry and Matyi, for the same reason: the ALJ did not credit the portion of these opinions finding Williams to be severely restricted in her ability to interact socially.  Doc. 16, p. 12.  But an ALJ is not required to adopt, verbatim, a medical opinion.  *See Poe v. Comm'r of Soc. Sec*., 342 Fed. App'x 149, 157 (6th Cir. 2009) (The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician, and the ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding.").  Moreover, the ALJ explained why he found Williams' social functioning to be less restrictive than Drs. Terry and Matyi had, commenting that there was minimal mental health evidence in the record to support such a restrictive finding.  Tr. 26.  The ALJ cited the following evidence, which he had previously discussed and/or cited (Tr. 22, 24-25), in support: Dr. Zerba's consultative exam notes from 2010 wherein Williams reported no depression, one anxiety attack per month, and improvement with medication (Tr. 310); Dr. Josell's consultative exam notes from 2013 wherein Williams reported anxiety attacks every other week and improvement with medication (Tr. 350); normal psychiatric exam findings in April, June and December 2014 (Tr. 417, 424, 482, 498) and September 2015 (Tr. 543); and improved mood with medications in April 2015 (Tr. 533).  Finally, the ALJ stated that Dr. Josell's opinions were generally consistent with Williams' testimony showing mild, and, at times, moderate limitations.  Tr. 26.  Dr. Josell had opined, regarding Williams' social

limitations, that she is capable of acting appropriately with others when needed, commenting that she had remarked that she had done "OK" in dealing with others at her past job.  Tr. 352. Williams testified that she did not have trouble working with others.  See Tr. 54-55 (Williams explaining that it does not affect her when she is criticized; she will say "yes sir," walk away, and correct what she had done wrong; and she testified that she had no problems getting along with others at work and would not have problems getting along with others if she were working now).  The ALJ explained his rationale for the weight he gave to the opinions of Drs. Terry, Matyi, and Josell; assessed an RFC that limited Williams to occasional superficial interaction with others; and his assessment and explanation are supported by substantial evidence in the record.  Accordingly, it must be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.


 Dated: May 11, 2018

_____
Kathleen B. Burke
United States Magistrate Judge


### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).